# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CARL CURTIS HODGES, HODGES
BROTHERS, INC. and HODGES
BROTHERS ROOFING, INC.,

                Plaintiffs,

v.                                      Case No:  6:11-cv-135-Orl-36GJK

SCHOOL BOARD OF ORANGE
COUNTY, FLORIDA,

                Defendant.
_____/

## <u>ORDER</u>

      This cause comes before the Court upon Defendant School Board of Orange County, Florida's ("Defendant") Motion for Summary Judgment on Plaintiffs' First Amended Complaint (Doc. 45).  Plaintiffs Carl Curtis Hodges ("Hodges"), Hodges Brothers, Inc. ("HBI") and Hodges Brothers Roofing, Inc. ("HBR") (collectively, "Plaintiffs") filed a Corrected Response in Opposition to Defendant's Motion for Summary Judgment ("Response")  (Doc. 105)[1], to which Defendant replied (Doc. 110).  Having determined that oral argument is unnecessary, the Motion for Summary Judgment is ripe for review.   Upon consideration of the parties' submissions, including affidavits, deposition transcripts, memoranda of counsel and accompanying exhibits, and for the reasons that follow, the Court finds that there are genuine issues of material fact as to Counts I and II of the Amended Complaint and thus summary judgment is inappropriate.

---

[1]  On October 18, 2012, the Court adopted in part the Magistrate Judge's Report and Recommendation issued on September 6, 2012 (Doc. 141).  *See* Doc. 181.  Having found that the Plaintiffs' additional allegations regarding the denial of HBI's bid on the Dr. Phillips High School chiller piping project constituted additional factual examples of an existing claim for relief, and not a new statutory basis entitling Plaintiffs' to relief, the Court will consider the Plaintiffs' Corrected Response in Opposition to Defendant's Motion for Summary Judgment (Doc. 105) and Defendant's initial and second Reply (Docs. 106, 110).  *Id.*

However, the Court finds that Defendant is entitled to summary judgment on Plaintiffs' Count III.

## I.   BACKGROUND

### A.  Material Facts[2]

#### 1.  Parties

Hodges resides in Orange County, Florida.  Doc. 107, ¶ 2.  HBI and HBR are Florida Corporations specializing in commercial construction and roofing, respectively.  *Id.*  Hodges is the sole shareholder and President of both HBI and HBR.  *Id.* ¶ 3; Doc. 170, p. 7.

Defendant operates, controls, and supervises the public school system in Orange County, Florida, also known as Orange County Public Schools ("OCPS").  *Id.* ¶ 3.

#### 2.  Contractual history between the parties

The record establishes that HBR and HBI have completed construction projects and direct purchase orders for Defendant over the past twelve years.  Doc. 127, ¶ 4; Doc. 141, p. 2.  During the relevant period, it is undisputed that HBI was engaged as a general contractor and construction manager with OCPS pursuant to the Continuing Contract for Construction Management Services, Vendor No. 0000121227.  Doc. 170, p. 7, ¶ 4; *see* Deposition of Carl Curtis Hodges, February 9, 2012, Doc. 51 ("Hodges Feb. 9 Dep."), Continuing Contract for Construction Management Services, Contract No. 08CM23CCONHODGES, Ex. 1 ("CM Contract").  On or around February 16, 2009, OCPS awarded HBI a construction management contract that is still in effect.  *Id.*

---

[2] The undisputed facts are taken from the parties' Joint Stipulation of Agreed Material Facts, (Doc. 107), and Amended Joint Pretrial Statement (Doc. 170).  The Court cites these documents where facts are undisputed, and otherwise determines facts based upon the record before the court: parties' submissions, affidavits, exhibits and deposition testimony.

In addition, on May 24, 2005, OCPS awarded HBR a roofing services contract, Vendor No. 0000112467 ("Roofing Agreement"), which provided that HBR was to perform exclusive roofing maintenance services on OCPS' facilities in the District Capital area for a period of one year.  Doc. 170, p. 7, ¶ 4; Hodges Feb. 9 Dep., pp. 17-18, Doc. 51-Ex. 12; Corrected Affidavit of Carl Curtis Hodges, Doc. 108 ("Corrected Hodges Aff.").  Defendant renewed the Roofing Agreement every year thereafter until May 2009.  Doc. 51-Ex. 12.  At that time, Defendant issued HBR another roofing agreement ("Roofing Services Contract"), providing Defendant with the option to renew for two additional one-year terms.  Hodges Feb. 9 Dep., Doc. 51-Ex. 13, p. 11.  Defendant extended the Roofing Services Contract twice: first from May 2010 to August 2010, and then from August 2010 through November 30, 2010.  *See* Hodges Feb. 9 Dep., Doc. 51, Exs. 14-15.

In August 2011, Defendant requested bids on a new roofing services contract, and emailed a copy of the notice to interested bidders to Plaintiffs on August 24.  *See* Hodges Feb. 9 Dep., Doc. 51-Ex. 19.  On September 8, 2011, Hodges attended the pre-bid meeting for that contract.  Doc. 51-Ex. 20.  On September 13, 2011, Plaintiffs sent Defendant a request for information regarding the new roofing services contract.  *See* Doc. 51- Ex. 21.  Hodges testified that he chose not to bid on that contract.  Hodges Feb. 9 Dep., Doc. 50, pp. 123-125.

### 3.  Plaintiffs report improper activity

In the Fall of 2008, Hodges met with OCPS General Counsel, Frank Kruppenbacher ("Kruppenbacher") and informed him that an OCPS employee, Kevin Gaston ("Gaston"), was engaging in improper and illegal activities.  Hodges Aff. ¶ 5; Corrected Hodges Aff. ¶ 5; Doc. 141, p. 2.  Hodges agreed to participate in the investigation of Gaston and provided Kruppenbacher with all of the information he had regarding Gaston's attempts to bribe and/or

extort contractors who performed services for OCPS.  *Id.* ¶ 6.  When the accusations against Gaston revealed that other OCPS employees might be involved, Hodges then assisted OCPS with the  investigation into allegations pertaining to Robert Proie, a Department Head of OCPS ("Proie").  *Id.* ¶ 7.  Hodges' complaints persisted through 2009, when in the late summer he reported to Kruppenbacher that the Facilities Department had been allowing contractors, including Hodges, to determine their own scope of work regarding smaller District Capital projects.  Doc. 98-Ex. 1, p. 5; Doc. 94, ¶ 20.

### 4.  Defendant's alleged acts of retaliation

In Fall of 2008, Plaintiffs bid on a two-year servicing project to re-pipe the chiller plant at Dr. Phillips High School ("2008 Piping Project").  Deposition of Kay Syed on February 21, 2012 ("Syed Dep."), Doc. 75, p. 10.  Plaintiffs submitted three bids for the project, including their final bid which fell under the million-dollar OCPS limit, but were not awarded the bid.  Hodges Corrected Aff., Doc. 108, ¶ 15.

On or about July 1, 2009, OCPS' Internal Audit Department conducted an annual risk assessment of its Facilities Department.  Deposition of Michael Smith, February 23, 2012 ("Smith Dep."), Doc. 55, pp. 5-6.  The purpose of the assessment was to determine whether the Department and contractors doing business with OCPS had been adhering to its internal policies and procedures. *Id.*, p. 8.  Beginning July 10, 2009, Mike Smith, Internal Audits Director, along with auditors Jan Skjersaa and Alva Johnson, audited a sample of District Capital projects from the 2008-2009 fiscal year. Selection of the sample was based on dollars spent (ranging from $50,000.00 to $1,000,000.00), the propriety of funds used, and the amount of work a particular contractor received from OCPS ("2009 District Capital Audit").  *Id.*, pp. 6-7; *see* 2009 District Capital Audit, Doc. 69-Ex. 9. According to Smith, HBR's roofing projects, being the "lion's

share" of work completed in the District Capital area, were included in the sample projects audits.  Smith Dep., Doc. 55, pp. 13, 44.

On June 16, 2010, Defendant's Assistant General Counsel John Palmerini ("Palmerini") sent an internal memorandum addressing Hodges complaints about OCPS corruption and allegations of retaliation.  *See* Palmerini Memo, Doc. 98-Ex. 1; Deposition of John Palmerini, February 1, 2012 ("Palmerini Dep."), Doc. 53-Ex. 3.  In the Palmerini Memo, Palmerini reviews Hodges' allegations, including those involving the 2009 District Capital Audit, and in assessing OCPS' liability, concludes that Hodges likely has a *prima facie* case of retaliation.  Palmerini Memo, p. 12.  After writing this internal memo, Palmerini testified that he learned about significant credibility issues with some of the people he spoke with, including Defendant's former employee Moe Khosravian ("Khosravian").  Palmerini Dep., Doc. 52, p. 106.  Also, Palmerini began to suspect Hodges was submitting invoices for work that he had not completed, which led him to question Hodges' credibility as well.  *Id.*, pp. 104-07.

### B.  Procedural History

On August 29, 2011, Plaintiffs filed their Amended Complaint against Defendant, alleging three claims for relief.  Doc. 22.  In Count I, Plaintiffs assert a violation of 42 U.S.C. § 1983, claiming that Defendant retaliated against them for objecting to Gaston's unlawful conduct and Proie's abuse of the bidding process.  *Id.*, ¶¶ 31-32.  In Count II, Plaintiffs assert a violation of Florida's Public Sector Whistle Blower's Act, claiming that Defendant retaliated against them because of their objections and information indicating that their employees were committing gross mismanagement, malfeasance, misfeasance, gross waste of public funds and/or gross neglect of duty.  *Id.*, ¶¶ 36-37; *see* Fla. Stat. § 112.3187.  In Count III, Plaintiffs assert a claim for defamation, alleging that Defendant intentionally or negligently published the false

statements that they "failed to perform the scope of work as contracted and that Plaintiffs engaged in poor workmanship on the Evans Media Center roof project, and other projects, and misappropriated funds." Doc. 22, ¶ 40.

## II.   <u>STANDARD</u>

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact.  *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).  That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case."  *Celotex Corp.*, 477 U.S. at 323.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact.  *Id.* at 324.  Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 248-49 (emphasis in original).  A fact is "material" if it may affect the outcome of the suit under governing law.  *Id.* at 248.  In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla*., 344 F.3d 1161 (11th Cir. 2003).

### III.   __ANALYSIS__

Defendant argues that it is entitled to summary judgment on Counts I and II of the Amended Complaint because Plaintiffs cannot demonstrate that Defendant retaliated against them.  Doc. 45, p. 12.  In Count I, Plaintiffs allege that pursuant to 42 U.S.C. § 1983 Defendant retaliated against them because of their speech in violation of the First and Fourteenth Amendments of the Constitution.   Doc. 22, ¶¶ 29-32.   To establish a *prima facie* case for retaliation based upon speech, a plaintiff must show: (1) a protected activity; (2) an adverse action; and (3) a causal connection between the protected activity and the adverse employment action.  *Grier v. Snow*, 206 Fed. Appx. 866, 868 (11th Cir. 2006).

In Count II, Plaintiffs assert a violation of Florida's Public Sector Whistle-blower's Act, claiming that Defendant retaliated against them because of the complaints and information they provided indicating that Defendant's employees were committing gross mismanagement, malfeasance, misfeasance, gross waste of public funds and/or gross neglect of duty.  Doc. 22, ¶¶ 36-37; Fla. Stat. § 112.3187 (2002).  Florida's Whistle-blower statute "prevents agencies from taking retaliatory action against an employee who reports to an appropriate agency violations of law on the part of a public employer that create a substantial and specific danger to the public's health, safety, or welfare."  *Rice-Lamar v. City of Fort Lauderdale*, 853 So. 2d 1125, 1131-32 (Fla. 4th DCA 2003).  The statute also prevents a public employer from retaliating against an employee who discloses information to an appropriate agency alleging an abuse or gross neglect of duty on the part of an agency, public officer or employee.  *Id.* at 1132.  To state a claim pursuant to Florida's Whistle-blower statute, a plaintiff must allege that: (1) he engaged in a

statutorily protected expression or activity;[3] (2) he suffered an adverse employment action; and (3) there is a causal connection between the events.[4]  *Id.*  Once a *prima facie* case has been established, the employer must proffer a legitimate, non-retaliatory reason for the adverse employment action.  *Id.* at 1133.  The plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the proffered reason is a pretext for prohibited, retaliatory conduct.  *Id.*

### A.  Hodges participated in a protected activity

For purposes of its Motion for Summary Judgment, Defendant does not dispute that Hodges qualifies as a "whistle-blower" for complaining and providing information about Gaston in the Fall of 2008, and about Proie in 2009.  Doc. 45, pp. 4, 16.[5]  Accordingly, the Court will not examine the sufficiency of Plaintiffs' proof with respect to this element.

### B.  Genuine Issues of Material Fact Regarding Defendant's Alleged Retaliations Preclude Summary Judgment on Counts I and II

In Count I, Plaintiffs must prove that their freedom of expression was punished through Defendant's retaliation.  *Grier*, 206 Fed. Appx. at 888.  Similarly, in Count II Plaintiffs must

---

[3] A "protected activity" is the disclosure to a public agency of any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds or gross neglect of duty committed by an employee, agent or independent contractor for an agency.  *See* Fla. Stat. § 112.3187(5)(b).

[4] Florida Whistle-blower claims are analyzed under the same framework as Title VII retaliation claims.  *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000).

[5] On October 10, 2012, Defendant submitted a Notice of Supplemental Authority discussing Plaintiffs' burden to prove, with respect to their First Amendment Retaliation claim, that the alleged protected speech was a matter of public concern.  Doc. 176 (citing *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr*, 116 S. Ct. 2342 (1996)).  On October 22, Plaintiffs filed a Motion to Strike Defendant's Notice of Supplemental Authority.  Doc. 184. First, as Plaintiffs have already discussed *Umbehr* in their Response to Defendant's Motion for Summary Judgment, it is not a new authority, for which a notice of supplemental authority is warranted.  *See* Doc. 105, pp. 5-7.  Moreover, Defendant cannot raise new arguments in a Notice of Supplemental Authority, or attempt to file an additional reply to Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment, without leave of Court.  *See* Local Rule 3.01(c).

prove that Defendant retaliated against them for their whistleblowing activities by taking adverse actions affecting their rights or interests. *Rice-Lamar*, 853 So. 2d at 1132-33. Accordingly, because genuine issues of material fact regarding the alleged retaliations preclude summary judgment on both of these Counts, the Court examines Defendant's alleged retaliatory actions.

### i. There is a genuine issue of material fact regarding the statements contained in the 2009 District Capital Audit

Plaintiffs allege that Defendant's retaliatory actions included "false and defamatory statements and positions being set forth in a Internal Audit performed upon [HBI and HBR] for submission to the COVE Committee" and "initiating an unwarranted audit of Plaintiffs." Doc. 22, ¶¶ 15, 19. The evidence before the Court suggests that the occurrence of both audits at issue was routine, and each focused on Defendant's policies and procedures rather than Plaintiffs' work product. Doc. 45, p. 5. However, with respect to the 2009 internal audit of Defendant's District Capital Program ("2009 District Capital Audit"), a genuine issue of material fact remains as to whether the findings relating to Plaintiffs' work were negatively biased by retaliatory intent.

The record establishes that the 2009 District Capital Audit occurred as a result of a routine risk assessment of Defendant's Facilities Department, and was intended to determine whether the District Capital Program complied with Defendant's policies and procedures during the 2008-2009 fiscal year. Jan Skjersaa ("Skjersaa"), Defendant's internal auditor primarily responsible for the 2009 District Capital Audit, testified that the audit was a routine assessment. *See* Deposition of Jan Skjersaa, February 1, 2012 ("Skjersaa Dep."), Doc. 53, p. 15, lines 2-4: p. 16, lines 1-25: p. 17, lines 11-15: p. 18, lines 13-19 ("the scope was to focus in on the work done by Capital Projects…to see if they had followed their policies and procedures."): p. 35, lines 23-25; *see* 2009 District Capital Audit, Doc. 69-Ex. 9. Skjersaa explained that there are few vendors

that do work for Capital Projects, and that he pulled a list of purchase orders made out to those entities, and selected one from each vendor. *Id.* at p. 17, lines 11-15. Similarly, Skjersaa's former supervisor, Michael Smith ("Smith"), testified that Defendant performs annual risk assessments; first identifying what they consider high risk issues and then determining what to audit. *See* Smith Dep., Doc. 55, pp. 20-26. Smith explained that in July 2009, he and the other auditors determined that they would audit the District Capital Projects. *Id.* at p. 19, lines 11-25.

With respect to the specific conclusions about Plaintiffs' work contained in the 2009 District Capital Audit, a genuine issue of material fact remains as to whether the negative findings were motivated by animus towards Plaintiffs. First, Plaintiffs' claim that at the conclusion of the 2009 District Capital Audit, "the General Counsel's office opined that Jan Skjersaa had conspired with Mr. Proie to render negative findings against Plaintiffs" mischaracterizes the Palmerini Memo.[6] Doc. 105, p. 11 (citing Skjersaa Dep.; Smith Dep.) The June 16, 2010 Palmerini Memo indicates that Hodges' initial complaints about impropriety in Defendant's Facilities Department prompted investigation into all District Capital Project contractors, not just Plaintiffs. *See* Palmerini Memo, Doc. 98-Ex. 1, p. 5. Nevertheless, the Palmerini Memo points to a few conclusions in the 2009 District Capital Audit that Palmerini believed evidenced Skjersaa's bias against Plaintiffs, and exposed Defendant to legal liability. *Id.* Specifically, the 2009 District Capital Audit stated that Plaintiffs did not use the appropriate roof coating, Euraguard 1000, on the Evans High School Ninth Grade Media Center ("Evans Project"), and Skjersaa's irregular behavior regarding the testing for Euraguard 1000 was

---

[6] Moreover, Plaintiffs' citation to the Skjersaa Deposition, without a specific page number, for the argument that the 2009 District Capital Audit evidences retaliatory animus towards Plaintiffs, is disingenuous. Doc. 105, p. 11. Skjersaa in fact testified that the audit was routine and focused on Defendant's programs and procedures, not Plaintiffs' actions.

suspicious.[7]  *Id.* at pp. 5-7.  Palmerini points to a few of Skjersaa's actions as leading the Facilities Department and Hodges to believe that Skjersaa was biased against Hodges and was trying to thwart Kruppenbacher's efforts to investigate any mismanagement.  *Id.* at p. 7. Palmerini relays that he then conducted his own testing at the Evans Project with a manufacturer of Euraguard 1000, in the presence of Hodges and his attorney, and concluded that the Euraguard 1000 was indeed used as requested on the building.  *Id.* at p. 8.

Further, Palmerini writes that after taking over responsibility for investigating Hodges' complaints, he had a conversation with Michael Eugene, Defendant's Chief Operations Officer ("Eugene"), who described the first meeting he had with his operation team and auditors including Smith and Skjersaa.  *Id.* at p. 10.  According to Palmerini, Eugene recounted that "the auditors were discussing Hodges Brothers Roofing so much that he asked if it was 'an audit or an investigation, because usually an audit is done in a sample and an investigation is targeted.'"  *Id.*[8]

In sum, Defendant argues that the Evans Project and other HBR projects were cited in the 2009 District Capital Audit only insofar as they demonstrated examples of Defendant's own oversight issues.  Doc. 45, p. 7.  Thus, Defendant maintains that any statements in the 2009 District Capital Audit about Plaintiffs were not intended as retaliation.  *Id.*  Although the Court agrees that the 2009 District Capital Audit was focused on Defendant's compliance with its own policies and oversight, Plaintiffs have established a genuine issue of material fact with respect to

---

[7] For example, Palmerini notes that it is not appropriate for auditors to perform tests of this nature; that Skjersaa was going to pay for the testing himself, but Mikhail Klimon, the research engineer who completed the test, did not charge him; and that although the test did not conclude that the coat was not Euraguard 1000, Skjersaa cited it for such a finding.  Doc. 98-Ex. 1, p. 6.

[8] Palmerini testified that at the time he drafted the Palmerini Memo, he did not question the credibility of some of his sources of information, including some of Defendant's former employees and Hodges.  *See* Palmerini Dep., Doc. 52, pp. 104-07.  Palmerini's findings and conclusions regarding Defendant's exposure to liability in 2010 create a genuine issue of material fact.

whether some findings contained in the 2009 District Audit were motivated by retaliatory animus.

The second audit at issue is titled *Orange County District School Board Federal, Operational, and Federal Single Audit for the Fiscal Year Ended June 30, 2010* ("2010 Audit"), Doc. 45-Ex. 3.[9,10] Defendant argues that this was a routine triennial audit by the Florida Auditor General for the fiscal year of 2009 through 2010. The 2010 Audit raises concerns regarding Defendant's oversight of the seven HBR roofing projects similar to those expressed in the 2009 District Capital Audit. *See* 2010 Audit, pp. 71-75. The 2010 Audit recommends that the OCPS District "should enhance controls over roofing projects to ensure that required inspections are timely performed before project completion, contractors complete projects consistent with management's authorization, and payments for such services are consistent with applicable contract terms." *Id.* at p. 74. In responding to Defendant's Motion for Summary Judgment, Plaintiffs do not address the 2010 Audit. *See* Doc. 105; *Celotex*, 477 U.S. at 324. Accordingly, the evidence before the Court indicates that the 2010 Audit was a routine audit, focusing on Defendant's policies and projects, and was not an example of retaliation against Plaintiffs.

---

[9] The Court denied Plaintiffs' Motion to Strike the 2010 Audit (Doc. 116). *See* Doc. 181. With respect to Plaintiffs' authenticity concerns, the Court directed the parties to depose Gregory Centers, the Audit Manager, so that the 2010 Audit could be reduced to admissible evidence. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012).

[10] The Amended Complaint refers only to an "Internal Audit", which must mean the 2009 District Capital Audit, and Defendant "initiating an unwarranted audit of Plaintiffs." Doc. 22, ¶¶ 15, 19. Nevertheless, given the extensive litigation regarding the 2010 Audit, the Court discusses the 2010 Audit.

ii. **The denial of HBI's bid on the 2008 Piping Project is not consistent with Plaintiffs' claim that Defendant's retaliation began in late 2009**

In their Response, Plaintiffs argue that Defendant's denial of HBI's bid on the 2008 Piping Project was an example of retaliation.[11]  *See* Doc. 105, p 10.  Defendant maintains that this example, raised for the first time in opposition to its Motion for Summary Judgment, is inconsistent with the Amended Complaint, and Hodges' Original and Corrected affidavits.  Doc. 110, pp. 2-5.  The Court agrees with Defendant.

First, Plaintiffs' argument that the 2008 Piping Project is an example of retaliation contradicts the Amended Complaint, which alleges that Defendant's retaliatory actions began after Proie learned that Hodges complained and provided incriminating information regarding Proie unlawfully coercing employees to award contracts to certain vendors.  Doc. 22, ¶¶ 13-19 (asserting "in the Summer of 2009, Mr. Proie was informed" of Hodges' participation in the investigations and that "[a]fter the participation by Mr. Hodges in these investigations, and since the time that Mr. Proie was advised of such, both [HBI and HBR], have been subjected and targeted with adverse action. . .").

Second, in his original affidavit, Hodges affirms that the alleged retaliatory acts began in "late 2009."   Doc. 95, ¶ 13.  Hodges' description of the 2008 Piping Project indicates that Defendant awarded the project to Frank Gay Plumbing in contravention of its own project limitations, but does not directly identify the lost bid as an act of retaliation.  *Id.* ¶ 15.  While Hodges' Corrected Affidavit also states that the alleged retaliatory conduct began in "late 2009", when Proie learned of Hodges' complaint, Doc. 108, ¶ 13, it articulates for the first time that

---

[11] The Court denied Defendant's Motion to Strike the 2008 piping project allegation, determining that it was an additional factual example of an existing claim, and not an additional statutory basis for relief from Defendant.  *See* Doc 181, pp. 5-9; *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).

Defendant's refusal to approve HBI's contract for the 2008 Piping Project was in retaliation for his 2008 complaints about Gaston's improper conduct to Kruppenbacher.  *Id.* at ¶ 15.[12]  Plaintiffs do not specify how Hodges' complaints to Kruppenbacher prompted this alleged retaliation in 2008.  In addition to the internally and externally inconsistent claims in Hodges' affidavits, the fact that Defendant awarded HBI a construction contract in February 2009 and HBR a roofing services contract in May 2009 undermines the argument that the retaliation began in 2008.  Doc. 110, p. 5; CM Contract, Doc. 51-Ex. 1; April 23, 2009 Roofing Services Addendum, Doc. 51-Ex. 13.  Hodges clearly states that Defendant's retaliation began in late 2009.   Therefore, the Court will not consider the contradictory affirmation in Hodges' Corrected Affidavit that the retaliation began in 2008.

Moreover, as Defendant has demonstrated, Plaintiffs' attempt to include the 2008 Piping Project as an example of retaliation is unsupported by evidence in the record, excluding the Corrected Affidavit.[13]   The argument that this example constitutes retaliation contradicts the temporal construct presented in the Amended Complaint and each of Hodges' Affidavits. Further, while Hodges discussed the 2008 Piping Project in his deposition, he identifies it as an example of OCPS' corruption and mismanagement but does not explicitly refer to it as retaliation.  *See* Hodges Feb. 9 Dep., p. 45, lines 11-20.[14]  Although Plaintiffs have argued that

---

[12]  Hodges Corrected Aff., Doc. 108, ¶ 15 ("After I complained about Mr. Gaston, OCPS retaliated against HBI and me in refusing to approve HBI's CM contract for the re-piping of the chiller plant.").

[13]  Given this finding, the parties need not conduct further discovery on the 2008 Piping Project. Accordingly, Defendant's Motion, seeking to supplement its discovery responses and reopen discovery on this issue, filed on October 24, 2012, will be denied as moot.  Doc. 186.

[14]  "A. So Charles Davis, Kay Syed got together this is what Charles told me, explained to me, that they got together and they said they can do this job and save a half a million dollars by doing it.  And so they ended up doing the job into five pieces.  So we can't do it with Hodges for under a million, but we can go and get Frank Gay Plumbing and break the law and do it into five separate pieces and to make sure that they get the job."

the listed retaliatory actions alleged are not exhaustive,[15] they have presented no credible evidence suggesting that Defendant's awarding of the 2008 Piping Project to another party was retaliatory.

>   **iii.  A genuine issue of material fact exists as to whether business opportunities were withheld from Plaintiffs following Proie's knowledge of Hodges' complaint**

Plaintiffs allege that after Proie became aware of Hodges' complaints, OCPS retaliated against Plaintiffs by, among other things, "denying and withholding future contracts and business opportunities between Plaintiffs and OCPS."  Doc. 22, ¶ 19.  Defendant argues that there is no evidence demonstrating any contract-related adverse action.  Doc. 45, pp. 7-11.

First, with respect to the CM Contract, the parties do not dispute that this contract is still in effect between Defendant and HBI.  Doc. 170, p. 7, ¶ 4; Hodges Feb. 9 Dep., Doc. 51-Ex. 1. The evidence demonstrates that between 2009 and 2011, HBI has been assigned $3,088,351.00 in projects under the CM contract.  *See* Doc. 45-Ex. 4, pp. 3-4.   During the same period, Defendant's other construction vendors Wharton-Smith and R.L. Burns have been assigned $2,567,730.00 and $1,661,847.00 in projects, respectively.  *Id.*  In 2010, during the alleged period of retaliation, Defendant assigned HBI the Meadow Woods Middle School and the Educational Leadership Center Parking Garage projects, totaling $1,676,935.00.  *Id.* at p. 2. Given Defendant's identification of evidence on the record demonstrating that Plaintiffs have not been retaliated against with respect to the CM contract, the burden shifts to Plaintiffs to designate specific facts showing a genuine issue of material fact.  *Celotex*, 477 U.S. at 324.  Plaintiffs do not address the CM Contract in their Response.  *See* Doc. 105.  There is no evidence in the record supporting any retaliation against Plaintiffs with respect to the CM Contract.

---

[15] *See* Doc. 22, ¶ 15 ("Such retaliatory adverse actions include but are not limited to…").

Second, with respect to the Roofing Agreement between Defendant and HBR, Plaintiffs argue that beginning in late 2009, Defendant ceased giving HBR roofing work.  Doc. 105, p. 8; Hodges Corrected Aff., ¶ 14 ("For example in 2008, HBR received at least 67 purchase orders to perform maintenance work on OCPS roofs and by 2010, the number of purchase orders to perform work had reduced to 8. During the period of 2008 through 2010, HBR was the exclusive roofer for OCPS for repairs and maintenance.").  Defendant argues that there is no evidence demonstrating that Defendant withheld roof repair work from HBR.  Doc. 45, p. 10.  However, Plaintiffs have presented sufficient testimony to create an issue of fact as to whether Defendant withheld roof repair work in retaliation for Hodges' whistleblowing.

First, Khosravian, who worked in the OCPS Facilities Department between 1992 and 2011 and reported directly to Proie, affirmed that during his two decade tenure with OCPS, roofs were in constant need of maintenance.  Doc. 94, ¶ 13.  Khosravian affirmed that in 2010, he spoke with Defendant's General Counsel Diego Rodriguez who expressed disbelief that there were no roof leaks at any of OCPS' schools.  *Id.*  Given the number of OCPS schools, Khosravian declared that it would be extremely rare if a year passed when roof repairs were not required.  *Id.* ¶ 15.  In addition to doubting the absence of many roof repair needs, Khosravian specifically affirmed a conversation that he had with Proie in February or March of 2010, following Hodges' appearance in the media criticizing OCPS.  Proie asked Khosravian and his colleague Glen White ("White") if they had read the newspaper and knew what Hodges was saying about OCPS.  *Id.* ¶ 23.  Khosravian declared that after he and White acknowledged that they had, Proie stated that they were not "to give that son of a bitch [Hodges] any more work with OCPS because he went to the media."  *Id.*  Khosravian understood that he was prohibited from giving "any other projects to any of the Hodges entities."  *Id.*  White testified that he did

not recall Proie saying that statement in his presence, but did recall Khosravian recollecting conversations with Proie where Proie complained about Hodges talking to the media and making Proie look bad. *See* Deposition of Glenn White on February 20, 2012 ("White Dep."), Doc. 45, pp. 45-50. White testified that he recalled Khosravian telling him that Proie told him to not give Hodges more work. *Id.* at pp. 54-56.

Following his conversation with Proie, Khosravian spoke with Jim Surguine ("Surguine"), an OCPS employee, concerning the need to make repairs on a particular building. Doc. 94, ¶ 24. According to Khosravian, Surguine said he wanted to call HBR to perform the repairs but knew that he could not do so because he had been told by Proie that Hodges entities were no longer allowed to perform work for OCPS because Hodges spoke with the media. *Id.* Upon speaking with Proie a second time about Plaintiffs and explaining that the Facilities Department was receiving many roof repair requests, Khosravian affirms that Proie again instructed him not to give the work to the Hodges entities and if there was a roof in need of emergency repairs, to let him know first. *Id.* at ¶ 25.

In his deposition, Surguine confirmed that he worked with Khosravian and thought he was an honest person, but only vaguely recalled that Khosravian had been involved in the whistleblowing complaints at that time. Deposition of Jim Surguine on February 20, 2012 ("Surguine Dep."), Doc. 73, pp. 84-86. Also, Surguine opined that budgetary constraints potentially contributed to Defendant's contraction of roofing repairs from 2008 to 2010. *Id.* at pp. 71-71. In contrast, Leslie Komurke, head of Defendant's budgetary office, testified that there were sufficient funds to repair leaking roofs at OCPS schools during the relevant times. *See* Deposition of Leslie Komurke on February 21, 2012 ("Komurke Dep."), Doc. 77, pp. 57-59. Given the facts as sworn in Khosravian's Affidavit, and their partial confirmation through the

17

testimony of Surguine and White, genuine issues of material fact preclude a finding that Defendant did not retaliate against Plaintiffs by giving them less work under the Roofing Agreement.

Plaintiffs further argue that Defendant's decision to re-bid the Roofing Agreement in 2010 was retaliation for Hodges' conduct as a whistle-blower.  Doc. 105, p. 9.  The unambiguous terms of the contract give Defendant the option to extend the Roofing Agreement with HBR, for up to two additional one-year terms.  *See* Hodges Feb. 9 Dep., Doc. 70-Ex. 13, ¶ 2.2.[16]  Also, Hodges testified that Defendant's decision not to extend the Roofing Agreement past November 30, 2010 and to re-bid it was not an act of retaliation.  Hodges Feb. 9 Dep., Doc. 51, pp. 269-70.  Although Palmerini indicated that Defendant's employee Kay Syed's ("Syed") explanation for why the contract was being bid was curious, he explicitly affirmed that Defendant had the discretion to re-bid under the terms of the contract and did not conclude that the contract was rebid in an act of retaliation.  *See* Palmerini Memo, Doc. 98-Ex. 1, pp. 10-11.  Given the unambiguous terms of the Roofing Agreement and Hodges' own testimony that he did not think Defendant's decision to re-bid in 2010 was retaliatory, the record before the Court does not support Plaintiffs' contention that the decision to re-bid the Roofing Agreement in 2010 was retaliation.  Accordingly, the Court finds that Defendant's decision to re-bid the Roofing Agreement was not a retaliatory action.

---

[16] 2.2 CONTRACT RENEWAL
The School Board reserves the right to renew any or all prices, terms, conditions and specifications of the contract, for up to two (2) additional one year periods, upon mutual agreed by both the District and awarded Contractor.  All renewals must be submitted in writing to include the awarded Contractor's Authorized Representative's signature.

### C.  There is a genuine issue of material fact regarding a causal connection between Hodges' protected activity and alleged retaliation

In order to succeed on its claims of First Amendment retaliation and violation of the Florida's Whistle-blower's Statute, Plaintiffs must establish a causal connection between the protected activity and the adverse employment action.  *Grier*, 206 Fed. Appx. at 868; *Rice-Lamar*, 853 So. 2d at 1132-33.  Specifically, Plaintiffs must show that the decision makers were aware of the protected conduct.  *Hammons v. George C. Wallace State Community College*, 174 Fed. Appx. 459, 464 (11th Cir. 2006).  Also, absent evidence of other causation, the temporal proximity between the protected activity and the adverse action must be "very close."  *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) (holding by itself, the three-month period "does not allow a reasonable inference of a causal relation between the protected expression and the adverse action").

Defendant argues that there is no temporal proximity between Hodges' alleged whistleblowing and the alleged retaliatory acts.  Doc. 45, p. 15.  Plaintiffs allege that Hodges complained and informed Defendant about Gaston in Fall of 2008, and objected about Proie's conduct to Kruppenbacher after May of 2009.  *See* Doc. 22, ¶¶ 9, 13-14; Doc. 105, p. 19, n.14.  Defendant explains that even if it is determined that Defendant did not assign HBR roof repairs pursuant to the Roof Agreement between May and November 2010, this retaliation would have occurred more than eighteen months after Hodges informed Kruppenbacher about Gaston and many months after Hodges informed about Proie.[17]  Also, the 2009 District Audit was initiated in

---

[17] The Amended Complaint does not specify when in 2009 Hodges informed Defendant's General Counsel about Proie's alleged misconduct.  *See* Doc. 22.  Defendant argues that it was in the summer or fall of 2009, Doc. 45, p. 6, and Plaintiffs argue that Hodges relayed these complaints to Kruppenbacher "through mid-2009."  Doc. 105, p. 19.

late June or early July 2009, at least six months after Hodges complained about Gaston, and before Hodges complained about Proie's conduct.[18]  Doc. 45, pp. 16-17.

Indeed, as Defendant argues, when a plaintiff relies upon mere temporal proximity to establish causation, the Eleventh Circuit demands close proximity.  Doc. 45, pp. 15-16 (citing *Grier*, 206 Fed. Appx. at 868; *Higdon*, 393 F.3d at 1221.  Here, testimony on the record provides additional evidence of causation.  Doc. 105, p. 19.  Although his testimony differed from that of White and Surguine, Khosravian testified to hearing Proie state that because of Hodges' complaints and talking to the media about Defendant's mismanagement, the Facilities Department should not give HBR and HBI work.   Khosravian Aff., Doc. 94, ¶¶ 23-26.  Therefore, although in the absence of other evidence, the temporal proximity between Hodges' protected conduct and the alleged retaliations is insufficient, the existence of additional evidence of causation precludes summary judgment on this element.

### D. Plaintiffs have presented sufficient evidence to create a genuine issue of material fact as to whether the alleged retaliation was caused by Defendant's official policy

In its Motion for Summary Judgment, Defendant correctly notes that local government can only be held liable pursuant to 42 U.S.C. § 1983 when its "official policy" causes the violation of plaintiff's rights.  Doc. 45, p. 17; *Monell v. Dept. of Social Services of New York*, 436 U.S. 658, 692 (1978); *Adcock v. Baca*, 157 Fed. Appx. 118, 120 (11th Cir. 2005).

---

[18] Plaintiffs argue that Defendant's rejection of their bid on the 2008 piping project just months after Hodges complained about Gaston demonstrates temporal proximity. The Court has concluded, *supra*, that there is no credible evidence that this was a retaliatory action, given the time period at issue here.  Similarly, Plaintiffs' argument that the 2009 District Audit was initiated a few months after Hodges' complaints about Proie is unpersuasive, as the record evidence suggests that the occurrence of the audit was routine.  Instead, genuine issues of material fact exist as to whether the findings in the audit relating to Plaintiffs' work were negatively biased by retaliatory intent.

Defendant argues that it is entitled to summary judgment on Count I because Plaintiffs cannot demonstrate that the alleged retaliation was caused by Defendant's official policy.

In its Response, Plaintiffs argue that there remain genuine issues of material fact concerning whether Defendant's officially promulgated policy or its unofficial custom, as shown through repeated acts of a final policy maker, resulted in the alleged retaliations suffered by Plaintiffs. Doc. 105, p. 14 (citing *Grech v. Clayton County*, 335 F.3d 1326, 1329 (11th Cir. 2003)). Also, Plaintiffs maintain that under certain circumstances, a single act by a final policy-maker with such authority can give rise to municipal liability pursuant to 42 U.S.C. § 1983. *Id.* at p. 14, n.10 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (the "official policy" requirement was intended to distinguish acts of the municipality from random employee decisions, and therefore "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances")). Accordingly, Plaintiffs argue that Proie acted as a final policy maker for Defendant in construction and maintenance issues, determining which contractors were given business.[19] *Id.* at p. 15. Khosravian testified that as the Chief Facilities Officer, Proie was a "member of the Superintendent's cabinet and he was able to make all decisions concerning which pre-approved vendors and contractors received work from OCPS." Khosravian Aff., Doc. 94, ¶ 9. Hodges testified that in 2009, he learned Proie was "coercing OCPS employees to award contracts to certain vendors." Hodges Aff., Doc. 95, ¶ 8.

Indeed, municipal liability pursuant to 42 U.S.C. § 1983 can attach if an official tasked with establishing a particular policy makes a deliberate choice to follow a particular course of

---

[19] Plaintiffs cite to the Deposition of former OCPS Superintendent Ron Blocker from another action involving alleged violations of First Amendment Rights as demonstrative of the extent of Proie's authority. *See* Doc. 105, p. 16. Having provided no case number or docket entry, the Court cannot review this evidence.

action.  *Pembaur*, 475 U.S. at 483-84; *see Arroyo v. Judd*, 2010 WL 3044053, *2 (M.D. Fla.

2010); *Lane-Gardner v. City of Tampa*, 2009 WL 3417859 (M.D. Fla. 2009) (for this type of

municipal liability, the decision maker must possess final authority).  Defendant maintains that

there is no affirmative evidence demonstrating that Proie possessed the type of controlling

authority that is required to hold Defendant liable.[20]  Doc. 45, p. 18.  While the Court agrees that

Plaintiffs have provided minimal evidence indicating that Proie had final authority with regard to

the awarding of construction and maintenance work, Plaintiffs have presented sufficient

evidence, with Khosravian's Affidavit, to create a genuine issue of material fact as to whether

the alleged retaliation was caused by Defendant's official policy.  Therefore, Defendant is not

entitled to summary judgment as to Count I of the Amended Complaint.

### E.  Defamation

In Count III, Plaintiffs allege that Defendant intentionally or negligently published false

statements that they "failed to perform the scope of work as contracted and that Plaintiffs

engaged in poor workmanship on the Evans Media Center roof project, and other projects, and

misappropriated funds."  Doc. 22, ¶ 40.  Plaintiffs' defamation claim is based on statements

allegedly made by Defendant's employees to the Orlando Sentinel regarding the 2009 District

Capital Audit.  *See* "Contentious audit exposes sloppy oversight of construction, maintenance

costs in Orange County school district", April 21, 2010, *Orlando Sentinel* ("Sentinel Article"),

Doc. 45-Ex. 6.  In order to succeed on their defamation claim, Plaintiffs must demonstrate that:

(1) Defendant published a false statement; (2) about the Plaintiffs; (3) to a third party; and (4) the

---

[20] Defendant maintains that the record does not establish that Proie prompted or controlled the
2009 District Capital Audit.  Having found insufficient evidence that this Audit was initiated as
an act of retaliation against Plaintiffs, the Court need not examine Proie's role in orchestrating it.

falsity of the statement caused injury to Plaintiffs.  *Border Collie Rescue, Inc. v. Ryan*, 418 F.

Supp. 2d 1330, 1348 (M.D. Fla. 2006); *Bass v. Rivera*, 826 So. 2d 534, 534 (Fla. 2d DCA 2002).

Defendant argues that a complete defense to defamation is established if the alleged

defamatory statement was "substantially true" and was made with good motives.  *See* Florida

Standard Jury Instruction 405.9(b)[21]; Doc. 45, p. 19.   Defendant maintains that because its

employees' statements to the *Orlando Sentinel* reflected actual findings from the 2009 District

Capital Audit, and there is no evidence that Defendant's employees were motivated by malice

toward Plaintiffs when they made those statements, they cannot be liable for defamation.  Doc.

45, p. 19.   In their Response, Plaintiffs reiterate that the information contained in the 2009

District Audit was false.  Doc. 105, p. 20.  Specifically, Plaintiffs cite the finding that HBR failed

to apply the Euraguard 1000 to the Evans Project as a false statement in the 2009 District Audit.

*Id.*  Finally, Plaintiffs argue that the failure to correct published false information once the party

becomes aware that the information is false has been held actionable.  *Id.* (citing *Lee v. Security

Check, LLC*, 2010 WL 3075673, *5 (M.D. Fla. 2010)).

First, with respect to the Sentinel Article, that article clearly focuses on Defendant's own

oversight and mismanagement problems, and not the quality of Plaintiffs' workmanship.  *See*

Doc. 45-Ex. 6.  Second, with respect to the Evans Project, the Sentinel Article questions HBR's

application of Euraguard 1000, but does not conclude that it was not used.  *Id.* at p. 4. (stating

"[t]he Evans media-center roof is still under investigation because auditors question whether

Hodges ever applied the proper coating designed to prevent leaks").  Thus, the statement about

---

[21] "Florida Standard Civil Jury Instructions 405.9(b).  Defense issue of truth and good motives: . . . the issue for your determination is whether the statement made by defendant was substantially true and was made by defendant with good motives.  A statement is substantially true if its substance or gist conveys essentially the same meaning that the truth would have conveyed.  In making this determination, you should consider the context in which the statement is made and disregard any minor inaccuracies that do not affect the substance of the statement."

the Evans Project in the Sentinel Article is not technically false.  *Border Collie Rescue,* 418 F.

Supp. 2d at 1348.  Moreover, although Plaintiffs claim that the internal Palmerini Memo "made

abundantly clear" that this claim about the Euraguard 1000 was false, the Palmerini Memo was

not written until more than two months after the Sentinel Article was published  Doc. 105, p. 20;

Palmerini Memo, Doc. 98-Ex. 1, pp. 8-10.  The Palmerini Memo indicates that the 2009 District

Capital Audit was likely incorrect regarding application of Euraguard 1000 on the Evans Project.

However, Palmerini's description of his own investigation into the incident demonstrates that

two months prior it would have been impossible for one of Defendant's representatives to have

knowingly or recklessly made a false claim about Plaintiffs with respect to this particular issue.

*See* Doc. 98-Ex. 1, pp. 8-10; *Border Collie Rescue,* 418 F. Supp. 2d at 1348.   Thus, the date of

the Palmerini Memo, contrary to Plaintiffs' depiction, affirms that Defendant was not knowingly

publishing a misstatement about Plaintiffs in the Sentinel Article.[22]  Finally, the case Plaintiffs

cite in support of their argument that Defendant had a duty to correct its representation to the

*Sentinal* following the Palmerini Memo relates to a specific statute not at issue in the present

case.  *Lee*, 2010 WL 3075673, *5 (M.D. Fla. 2010).[23]

　　　In sum, the Sentinel Article focuses on Defendant's mismanagement.  There is

insufficient evidence in the record to establish that Defendant knowingly or recklessly published

---

[22] Moreover, stating that auditors question whether or not a particular paint coat was used on the Evans Project is not a true or false statement.

[23] In *Lee*, the court acknowledges allegations of Defendant's actual knowledge that Plaintiff did not write a false check at issue in the litigation, would have been sufficient to assert the malice required by the Fair Credit Reporting Act ("FCRA").  The FCRA prohibits a consumer from bringing a defamation action against a consumer reporting agency, with respect to the reporting of information based on information disclosed pursuant to a requirement of the FCRA except as to false information furnished with malice or willful intent to injure the consumer.  15 U.S.C. § 1681h(e) (1997).  The court concludes that allegations of such knowing or reckless indifference to the truth were not present in this case.  *See Lee*, 2010 WL 3075673, *5.

a false statement about Plaintiffs' workmanship, with knowledge that the statement was false at the time it was published.  From a review of the article, it appears that the statements made in the Sentinel Article reflected the results from the 2009 District Capital Audit.  Moreover, Plaintiffs have provided no authority, and the Court is not aware that such exists, suggesting that Defendant would need to correct such a non-conclusory statement in a prior newspaper article following the receipt of an internal memorandum concluding that Euraguard 1000 probably was used on the Evans Project.  Thus, Plaintiffs have not demonstrated the existence of sufficient evidence to establish prong one, *i.e.*, that Defendant published a false statement, of the elements of defamation.  *See Border Collie Rescue*, 418 F. Supp. 2d at 1348.  As no genuine issues of material fact exist, Defendant is entitled to summary judgment in its favor, as a matter of law, on Count III of the Amended Complaint.

## IV.   CONCLUSION

For the aforementioned reasons, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment.  To the extent Defendant contends that Plaintiffs cannot establish economic damages, that argument was considered by the Court and rejected as without merit..

Accordingly, it is hereby **ORDERED** and **ADJUDGED:**

1. Defendant School Board of Orange County, Florida's Motion for Summary Judgment on Plaintiffs' First Amended Complaint, (Doc. 45) is **GRANTED in part and DENIED in part:**

   a. Count III of the Amended Complaint is dismissed, as Defendant is entitled to judgment in its favor, as a matter of law, as to Count III.  Defendant's Motion for Summary Judgment is, otherwise, **DENIED**.

**2.** Defendant School Board of Orange County, Florida's Motion to Supplement Response to

Plaintiffs' Motion to Exclude; Motion to Reopen Discovery, filed on October 24, 2012

(Doc. 186) is **DENIED as moot.**

**DONE** and **ORDERED** in Orlando, Florida on November 8, 2012.

Charlene Edwards Honeywell
United States District Judge

**Copies furnished to:**
Counsel of Record
Unrepresented Parties